Filed 7/2/21  In re J.T. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | B305995 (Los Angeles County Super. Ct. No. FJ54127) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.T., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Leventer, Judge Pro Tempore.  Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, William H. Shin and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After a series of Welfare and Institutions Code section 602 petitions detailing increasingly violent robberies over three years and corresponding escalating juvenile court discipline, the Los Angeles County Probation Department filed a notice under section 777 that J.T. had violated the conditions of his probation.[1] At the conclusion of the hearing on the section 777 notice, the juvenile court ordered J.T. committed to the California Department of Corrections and Rehabilitation Division of Juvenile Justice (DJJ) for a term not to exceed five years.

J.T. contends on appeal that the juvenile court abused its discretion when it ordered him committed to DJJ because less restrictive alternatives exist to meet the Welfare and Institution Code's statutory rehabilitative objectives. He also argues that he should have been awarded two additional days of predisposition custody credit and that a change in the law after the disposition hearing warrants a remand for the juvenile court to reconsider J.T.'s term of confinement.

We disagree with J.T. regarding his primary contention; we conclude that the juvenile court did not abuse its discretion when it committed J.T. to DJJ. But we will award J.T. the additional predisposition custody credit he requests and modify his sentence to conform with current law.

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

## BACKGROUND

Sixteen-year-old J.T.'s first interaction with the juvenile court was based on two section 602 petitions filed when J.T. was eleven years old.  On September 14, 2016, J.T. and others confronted a high school student as he exited a school bus, hit the victim in the face, and held him down and searched his pockets.  The victim in that incident was treated at a hospital for injuries he sustained during the incident.  On October 3, 2016, J.T. followed another victim, tried to take her cell phone from her pocket, and slapped the victim in the face.  Under the terms of an agreement with the People, J.T. admitted one count of second degree robbery associated with the September incident and a count of battery with the infliction of serious bodily injury associated with the October incident.  The juvenile court dismissed a count of assault by means of force likely to produce great bodily injury associated with the September incident.  At an adjudication and disposition hearing on October 19, 2016, the juvenile court placed J.T. home on probation.

J.T. was again detained on November 4, 2016 for two *separate* incidents that also happened in September and October 2016.  The petition alleged three counts of second degree robbery against three victims.  Two of the robbery counts were associated with an incident on September 12, 2016 and the third arose from an incident on October 26, 2016.  It also alleged one count, associated with the September 12, 2016 incident, of assault by means of force likely to produce great bodily injury.  Under the terms of an agreement, the juvenile court added a fifth count to the petition for battery causing serious bodily injury, dismissed the other four counts, and sustained the petition.  At an adjudication and disposition hearing on January 10, 2017, the

juvenile court placed J.T. in a placement outside of his home. J.T. ran away from the placement facility and a warrant was issued for his arrest.

On December 12, 2017, J.T. assaulted and robbed another victim. J.T. and three others punched and kicked the victim until he fell to the ground and stole the victim's cell phone. The petition alleged one count of second degree robbery, one count of assault by means of force likely to produce great bodily injury, and one count of resisting or obstructing a public officer. At an adjudication and disposition hearing on May 3, 2018, the juvenile court placed J.T. home on probation with his grandmother in Alabama. The record indicates that "unfortunately, [J.T.] continued his violent and delinquent behavior and was ultimately transported back to California on a violation." The record does not indicate what the violation was.

In July 2019, J.T. was released home on probation to his mother, whom the report notes "had not had custody of her son in nearly three years." The probation officer referred the family to family functional therapy, but J.T. failed to meet with the therapist. He was arrested again on August 10, 2019—before the rescheduled date to meet with the therapist. J.T.'s August 10, 2019 arrest was based on an incident in which J.T. and two others took a baseball bat from a victim and hit him with it before stealing his cell phone and hitting him two more times with the baseball bat.

On October 28, 2019, J.T. brandished a handgun, and while he pointed the handgun at the victim, demanded the victim's cell phone. J.T. demanded that the victim unlock the phone and, according to a probation report, "wipe it clean to avoid any tracing of the device." J.T. also stole the victim's shoes. The

4

October 30, 2019 petition charged J.T. with gang-affiliated second degree robbery and possession of a firearm by a minor.

While he was detained at juvenile hall pending adjudication of the October 2019 petition, on November 12, 2019 J.T. threw a 50-gallon trash can at a water fountain, which caused the water fountain to detach from the wall. Then on November 16, 2019, J.T. assaulted one of the officers at juvenile hall. These incidents resulted in the filing of a section 602 petition—eventually dismissed—alleging felony vandalism and battery of a custodial officer.

At an adjudication hearing for the October 2019 petition on January 28, 2020, the juvenile court sustained the petition as to the second degree robbery count and dismissed the firearm possession count and gang enhancement. The juvenile court ordered J.T. again placed at camp.

J.T. entered the camp program on March 3, 2020. On March 9, according to a probation department declaration, he "incited and participated in a gang-related major disturbance. The incident involved [numerous] youth and led to a staff and youth being injured and taken to the hospital." On March 22, 2020, he threatened to kill the camp nurse.

The probation department filed a section 777 notice of probation violation on March 25, 2020. It contained the following statement: "The probation records indicate[ that J.T.] had a total of 151 serious incident reports and 49 gang[-]related fights prior to his arrival at [his current camp placement]. This, along with his current incident reports at [his current camp placement], is a clear indication that he is not responsive to the available services provided to him by the County of Los Angeles. [¶] [J.T.'s current camp placement] residential treatment program is the highest

level of care, structure, and services available to youth at the county level." The probation report informed the juvenile court that the placement "put[ ] him, his peers, and staff in danger of injury." The report concluded that J.T. "is in need of a higher level of services where he can be safely housed in his own room, be housed for a longer period of time, so that his behavior can be [stabilized] and commitment to participating in treatment can be gained, and [where] he will be provided with the extensive post-release services that can help him successfully transition[ ] back into the community."

The juvenile court held the disposition hearing for the probation violation on May 6, 2020. J.T. requested either suitable placement or camp community placement. The juvenile court, however, explained: "I don't know what options I have, other than [DJJ], because there [have] been multiple petitions. There [have] been multiple violations. There [have] been multiple warrants. We have tried two suitable placements, two camp commitments. And as of today, there is misbehavior. [¶] Throughout his stay in juvenile hall and camp, there continues to be gang-related activity which would indicate that sending him back to camp is not really an option, certainly, not one that is going to help him. And we have looked at the possibility of an . . . out-of-the-area placement. And they have not been able to accept him into their program." The juvenile court heard further argument, and explained again: "[J.T.] was told if he was given a deal where he would go to camp for the underlying offense instead of [DJJ], this would be his last opportunity. That is after giving him many, many chances. He was told. Well, he was told that [DJJ] was going to be the alternative, if camp did not work out. But that was an offense where he assaulted someone with a

6

baseball bat after asking them what gang they were from." The court explained at length the considerations, J.T.'s escalating behavior and attempted resolutions, and detailed considerations of each potential alternative placement and the reasons J.T. had already failed in those placements. Ultimately, the juvenile court concluded on the record: "I think that there is no less restrictive environment available, except [DJJ]. I don't think one-on-one placement or support would necessarily be helpful. And it would certainly delay his ultimate[ ] return to the community."

Over J.T.'s objection and directly in response to argument from J.T. and his mother, the juvenile court explained that "I don't believe I have a meaningful alternative. And I have to be concerned about public safety. And when he is in the community, he is robbing people."

Based on the October 2019 petition, the juvenile court placed J.T. with DJJ, set the maximum term of confinement at five years, and awarded 190 days of credit for time spent in custody on the petition.

J.T. filed a timely notice of appeal.

## DISCUSSION

### A. Placement with DJJ

J.T. contends that the juvenile court abused its discretion when it committed him to DJJ. J.T. argues that the juvenile court was required to "consider less restrictive alternatives" to DJJ and to find "on the record, that [DJJ] will provide a probable benefit to appellant that cannot be provided in other settings." J.T. contends that these things were "not adequately done in this case."

"We review the juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision." (*In re N.C.* (2019) 39 Cal.App.5th 81, 85 (*N.C.*).)

"In determining the judgment and order to be made in any case in which the minor is found to be" a ward of the juvenile court, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) "The court may place the minor on probation, with or without declaring the minor a ward of the court, or it may declare the minor a ward and order appropriate treatment and placement. [Citations.] Placement options include the home of a relative or extended family member; a suitable licensed community care facility or foster home; juvenile hall; a ranch, camp or forestry camp; and, the most restrictive setting," DJJ. (*In re Greg F.* (2012) 55 Cal.4th 393, 404; see § 202.)

"Because rehabilitation is one of the primary objectives of juvenile court law, our statutory scheme ' "contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the [DJJ]." ' " (*N.C.*, *supra*, 39 Cal.App.5th at p. 85.) "At the same time, another primary objective of juvenile court law is to protect public safety." (*Id*. at pp. 85-86; § 202, subd. (d).)

J.T.'s briefing here does not contend that the juvenile court considered improper factors or failed to consider factors it should have. J.T. argues that the juvenile court did not *adequately* consider less restrictive alternatives and did not *adequately* state

on the record what benefit DJJ would afford J.T.  But J.T. makes no assertions about what the juvenile court could have or should have done differently.

Our review of the record indicates that the juvenile court considered the factors it was required to consider.  Over the course of more than three years, beginning when J.T. was 11 years old, the juvenile court heard evidence of robbery after robbery that followed a pattern.  The record establishes an escalation in J.T.'s gang activity, and robberies and assaults that reflect an increasing degree of sophistication and violence.  The juvenile court initially placed J.T. home on probation with his mother, and then moved through a series of attempted rehabilitative resolutions, including multiple camp placements, a placement with a relative in another state, a placement in a treatment facility, and multiple stays at juvenile hall.  The record indicates that at every turn J.T. resisted treatment, refused to cooperate in his own rehabilitation, attempted to escape from placements, became increasingly violent, and was eventually rejected from placements because he proved to be a danger to those around him and those charged with his care and rehabilitation.  J.T. cycled through and actively failed every placement that Los Angeles County could offer him.  The juvenile court's comments at the disposition hearing on May 6, 2020 establish that the juvenile court both considered *and attempted* every possible alternative before arriving at what it viewed as an inescapable conclusion to refer J.T. to DJJ.  When it arrived at that conclusion, the juvenile court explained why any less restrictive placement—the variety of placements it had already attempted that J.T. had rejected—were no longer possible, and what DJJ could offer J.T. that would benefit him in ways that

9

less restrictive alternatives had failed. The juvenile court viewed and stated on the record specific programs provided by DJJ—including vocational training and therapeutic services not available at the county level—that it believed would benefit J.T. The court stated that it would "attach and lodge into the file a packet of services that [DJJ] offers that [the court] think[s] could be helpful." The juvenile court also expressly weighed public safety in its analysis and concluded—expressly and supported by record evidence—that it no longer had any less restrictive alternative for J.T.'s rehabilitation.

We find no abuse of discretion.

## B. Predisposition Custody Credits

J.T. contends, and the People agree, that he is entitled to two additional days of predisposition custody credits. We have reviewed the parties' credit calculations, and agree that J.T. is entitled to 192 days of predisposition custody credits. We will order the trial court to correct the disposition order.

## C. Term of Confinement

The juvenile court committed J.T. to DJJ for a term of five years based on the maximum term of confinement for second degree robbery. J.T. contends that a 2020 amendment to section 731, subdivision (c) changed the maximum time J.T. could be committed to DJJ to three years. The People agree with J.T.'s contention.

Senate Bill No. 823 added the word "middle" to section 731, subdivision (c) effective September 30, 2020 to prohibit commission of "a ward to the [DJJ] for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 731, subd. (c); Stats. 2020, ch. 337, § 28.) The middle term of imprisonment for second

degree robbery is three years.  (Pen. Code, § 213.)  Based on the juvenile court's imposition of the maximum term of confinement, we will not remand the matter for another disposition hearing.  (See *People v. Winn* (2020) 44 Cal.App.5th 859, 873; *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)  We will direct the juvenile court to issue a new disposition order reflecting a maximum term of confinement of three years.

## DISPOSITION

The juvenile court is ordered to issue a new disposition order reflecting predisposition custody credits of 192 days and a three-year maximum term of confinement with DJJ.  The juvenile court's order is affirmed in all other respects.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

11